Filed 9/29/15  In re K.S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re K.S. et al., Persons Coming Under the Juvenile Court Law. | |
| J.S., Petitioner, v. THE SUPERIOR COURT OF MENDOCINO COUNTY, Respondent; MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Real Party in Interest. | A145394 (Mendocino County Super. Ct. Nos.  SCUKJVSQ1316824, SCUKJVSQ1316825) |

Petitioner J.S. (Father), father of seven-year-old K.S. and four-year-old Justin S., seeks review by extraordinary writ, pursuant to California Rules of Court, rule 8.452,[1] of the juvenile court's findings and orders, in which the court terminated reunification services and set the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code section 366.26.[2]  Father contends that substantial evidence does not support the juvenile court's finding that he did not make substantial progress toward

---

[1] All further rule references are to the California Rules of Court.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

reunification, and that, therefore, his reunification services should have been extended to the 18-month review hearing. We shall deny the petition for extraordinary writ.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 12, 2013, the Mendocino County Health and Human Services Agency (Agency) filed an original petition alleging that Father's two children and three stepchildren came within the provisions of section 300, subdivisions (b) and (j). Specifically, the petition alleged, as to Father, that he had used "inappropriate corporal punishment" on his stepdaughter, D.S. The abuse "consisted of striking her multiple times with a bamboo ca[n]e, and leaving raised welts on her buttocks and thighs." A voluntary case had been opened in January due to substantiated physical abuse allegations against Father, who "uses methamphetamine and Xanax and becomes physically abusive, verbally abusive, and physically aggressive by punching holes in walls." The petition further alleged that Father had a substance abuse problem that inhibited his ability to adequately parent his children. Finally, the petition alleged that Father had physically abused D.S. and there was a substantial risk that he would abuse his other two stepchildren and his two children.

The petition alleged, as to the mother of all five children (Mother), that she had an ongoing domestic violence relationship with Father, that the parents had verbally argued in the presence of the children, and that Father had threatened to kill Mother, most recently in July 2013. The petition also alleged that Mother had failed to protect the children from Father's physical abuse.

In the detention report filed on August 13, 2013, the social worker reported that there had been "no real participation" by Father in the voluntary case "at any point from January 2013 to August 2013." The children were presently in foster care. The Agency was concerned that Mother would not protect the children from physical abuse and that Father would "continue to physically abuse [D.S.], abuse drugs, and continue in a domestic violence relationship with [Mother]." Mother also seemed to use marijuana regularly, which could impair her judgment.

2

At the August 13, 2013 detention hearing, the juvenile court ordered the children detained, but gave the Agency discretion to release the children to Mother if she filed a restraining order against Father, engaged in services, and drug tested.

In the jurisdiction report filed on August 28, 2013, the social worker reported that all five children had been returned home to Mother. Mother had been referred to a support group and Father had been referred for visitation with all of the children and to the Empowerment Towards Recovery program. He was currently in substance abuse treatment with a therapist.

On October 2, 2013, the Agency filed an amended petition in which it requested that the section 300, subdivision (b)(4) allegation, that Father had a substance abuse problem, be stricken.

At the jurisdictional hearing, which took place on October 2, 2013, after hearing testimony from Father, the juvenile court struck the allegation that father had a substance abuse problem, but otherwise sustained the amended petition as to both parents. At Mother's request, the court also lifted the previously filed temporary restraining order as to her, but made the order permanent as to the children, with the exception of visitation as arranged by the Agency.

In the disposition report filed on November 14, 2013, the social worker reported that the children were still living with Mother. Father and Mother had married in 2012, after their children together—K.S. and Justin—were born. They had, however, been caring for all of the children together for the previous seven years.

Both parents were participating in services. The social worker described Father as "the most motivated father that I have ever worked with. He is very determined to change his behaviors to be able to return to his family. . . . He is pursing all suggested services. He realized that his lack of anger management was a deep problem,"[3] and therefore sought out an anger management program even before a referral had been made

---

[3] The report noted that Father had been raised by a violent father and had struggled with anger issues during his youth.

for that service. In addition to working with facilitator Santiago Simental at Alternatives to Violence, he was meeting with a substance abuse therapist and had started attending parenting classes that he had sought on his own. Once the restraining order between Father and Mother was lifted, Father immediately began participating in Family Strengths Wraparound Services (WRAP) meetings with Mother. He was about to begin individual therapy as well and had begun drug testing in August. His tests were all negative for any drug except marijuana, for which he had a medical marijuana card.

The social worker observed that Father had struggled with his anger issues despite being actively involved in a 52-week anger management course. When she suggested that he needed to address his issues more urgently, he asked for individual anger management sessions, which the social worker believed "demonstrates an added level of commitment." Due to his commitment to his family and his willingness to participate in services, the social worker believed Father "should be given the opportunity to make the changes necessary to reunite with his family." Although Father continued to use marijuana on a regular basis, "it [did] not appear that this issue affects his ability to parent his children." Father was punctual to his supervised visits with the children and was "longing for the day when he will be allowed to visit with [stepdaughter D.S.]."

The five children included Mother's three children (Father's stepchildren), who were ages 12, 10, and 9, and Mother and Father's two children, who were ages five and two. They were ambivalent about Father returning to the home, but enjoyed visitation with him. The social worker believed they had been "emotionally impacted by the chaos that was evident in their home environment. . . . With decreasing violence in actions and words in the home the children [were] beginning to relax." Both parents had said they were "willing to do whatever is needed to make their family whole again."

At the conclusion of the November 19, 2013 dispositional hearing, the juvenile court ordered family maintenance services for Mother as to all five children and ordered family reunification services for Father as to his two children, K.S. and Justin, adopting

4

the Agency's suggested case plan.[4] The court also ordered supervised visits with the children for Father.

The Agency filed a supplemental petition, pursuant to section 187, on May 5, 2014, in which it alleged that the children were at continued risk for physical abuse in that, on November 22 through November 24, 2013, Mother allowed the children to be cared for by a friend who physically abused several of the children. Then, on December 12, 2013, the same friend was in Mother's home caring for the children. In addition, on April 9, 2014, Mother "hit a child with a flip flop, slapped a child, pulled a child by the hair, and threatened to beat a child if [the child] misbehaved." On April 22, 2014, it was reported that Mother punched one child in the stomach and grabbed another child by the hair. On April 28, Mother reportedly slammed a child on the floor, causing her to hit her head. The petition further alleged that the children were at risk for emotional abuse when, on April 20, 2014, she "yelled, screamed, and berated all of her children," and chased one child out of the house.

In a detention report filed on May 6, 2014, the social worker reported that, due to reports of repeated incidents of physical and emotional abuse by Mother, which were confirmed by the children, all of the children were detained for their protection. According to the social worker, all of the children had reported that visits with Father had "been great with the older children saying that he is different now." Two of the children were placed in a foster home, one child was placed in a children's shelter, and Father had agreed to care for his two children until the detention hearing.

At the May 6, 2014 detention hearing, the Agency requested that the three older children be detained and that K.S. and Justin be placed with Father. At the conclusion of

---

[4] Father's case plan required him to (1) refrain using corporal punishment on the children; (2) participate in a substance abuse assessment and complete a treatment program, submit to random drug tests, and maintain a clean and sober lifestyle; (3) participate in and successfully complete a domestic violence/anger management treatment program; and (4) successfully complete a required support group/empowerment group related to dealing with anger and denial, and a parenting education program.

the hearing, the juvenile court detained all of the children from Mother, and placed K.S. and Justin with Father pending the jurisdiction/six-month review hearing.

In the six-month status review report filed on May 23, 2014, the social worker reported that Father had "done an amazing job of refraining from corporal punishment of the children." He had demonstrated that he had "taken a new approach to child discipline." He was very honest with the social worker when talking about the difficulties he had in learning new ways to discipline. Father was participating weekly in random drug testing, and had missed only one appointment in the past six months. He had never tested positive for any drug except marijuana or prescription medication. The social worker told Father that the goal was to be clean of all drugs and Father reported that he used marijuana less frequently than before. He was concerned about being told to refrain from use of marijuana as he used it to address pain from the broken back he had suffered in a car accident. Father continued to participate actively in a domestic violence prevention program, but had not attended his family empowerment group meetings for about two months.

Visitation had been going well, and the four older children had said many times that they wanted Father to be back in the home and the oldest three had said that "he has changed and that it is good being with him." Father was not visiting with D.S., "whom he refused to see due to his anger at her. He states that he feels [she] is at fault for the family being split again." Mother was visiting with all of the children weekly, but was "adamant" that her two youngest children would not be safe in the same home with Father.

Father had "done a very good job" of caring for K.S. and Justin who had been participating in an extended visit with him in the family home since May 1, 2014. However, Father had been unable to control his anger in a way that was not threatening to the various professionals who worked with his children. He had made progress, but still had work to do in this area. The social worker recounted an interaction Father and Mother had with a therapist, in the presence of K.S. and Justin, in which both parents discussed placing K.S. in foster care because D.S. had "ruined" her. Father also

6

exhibited posturing and a high degree of anger toward the therapist, which caused her to have "strong concerns" about him.[5] The Agency recommendation was that Father remain in family reunification status, which would allow more time for him to work on anger, parenting, and all aspects of his case plan so that he and Mother could be safely reunited with their children.

At the June 11, 2014 combined jurisdictional/six-month review hearing, mother submitted to jurisdiction, and the court sustained the supplemental petition as amended. The court also ordered that the children remain in out of home placement pending the disposition hearing on the supplemental petition.

The court then proceeded with the contested six-month review hearing. Santiago Simental, Father's domestic violence prevention facilitator and instructor, testified as an expert in domestic violence intervention and prevention. He testified that Father had been taking his course on alternatives to violence since October 2013. Father had attended a combined total of 29 group and individual sessions, with about seven excused absences. Although his participation was initially very limited, he had later become "honest and open" and "quite disclosing." He was not in denial about his issues with anger and was open to suggestions regarding tools he could use to deescalate his anger. When asked about Father's progress, Simental responded, "I believe it's coming along very well. That being said, I also sense that there's substantial work that can still be done."

Robert Distefano, a social worker assistant who had supervised the parents' visits, testified that he had seen a huge improvement in Father's temper since the beginning of the case. Regarding Father's visits with the children, Distefano said that his behavior had "been impressive" from the beginning in the way he could "bounce between" all of the

---

[5] In an email to the social worker, the therapist wrote that she had "strong concerns related to high levels of anger demonstrated by dad, lack of willingness to engage appropriately and safely and explosive outbursts. Dad appears to lack insight regarding detrimental impact of anger and statements made in [K.S.'s] presence. Dad made repeated statements regarding inability to care for [K.S.]. I am concerned about dad being able to keep [K.S.] safe."

children, giving each of them his attention, and that "[i]t was clear that he has an exceptional relationship with all the kids." Distefano did agree with Simental's opinion that Father needed additional anger management treatment.

Social Worker Paula Burns-Heron testified that she had been assigned to the present matter since it began as a voluntary case. Father did extremely well at visits. He came to visits prepared with activities in which he could include all of the children. He engaged with them and they had fun together. There was a "huge difference in [Father's] ability to handle his anger" since the beginning of the case. He had a good relationship with Burns-Heron and was very open with her about his challenges. He had told her that he now knew that it is not appropriate to use corporal punishment and that he was determined to find other ways to discipline.

Father had an extended visit with K.S. and Justin from May 1 to May 27, 2014. Burns-Heron had no concerns about Father's behavior with the children during that time. Even though K.S. was having behavioral issues, Father was acting appropriately in caring for the children. Father had been visiting with D.S. since November 2013, when he apologized for hitting her. However, he had stopped visiting her because he blamed her for causing the children to be removed from the home.

Burns-Heron was aware that Father had continued to have outbursts throughout the case and that he was not participating in substance abuse counseling, though she was not aware that he was no longer participating in individual therapy. She recommended that the children not be placed with Father and that he continue with reunification services because, "even though there has been a tremendous amount of progress and many things have changed, there is still a tremendous amount of work that needs to be done."

At the conclusion of the hearing, Father submitted on the social worker's recommendation of continued family reunification. The juvenile court ordered continued reunification services for Father. It found that Father had partially complied with the case plan and had not yet made significant progress toward alleviating or mitigating the causes that necessitated removal of the children. The court commended Father for the

8

work he had been doing, stating that "the extent of progress has been adequate." The court further found that there was a substantial probability that the children could be returned to Father's custody with the 12-month reunification period.

In a July 8, 2014 dispositional report based on the supplemental petition, the social worker reported that the children were currently placed in five separate foster homes. Both parents were cooperating and participating in reunification services. Father was still attending the Alternatives to Violence program with Santiago Simental and had reenrolled in a program with a substance abuse therapist. The therapist had allowed him to again try to participate in this service "in an appropriate manner," after having been unable to attend "due to aggressive and violent outbursts." Father was meeting with a new individual therapist and was also attending marriage counseling. He was participating in WRAP services and attending team meetings, but "often needed time to step out of the meetings for a cooling off period before he rejoined the group. His lack of understanding of the necessity for cooperating with the team goals and accepting in home services made it very difficult to move the case toward dismissal."

Father continued to participate in visitation with all of the children except D.S. There was "grave concern" that Father "continues to target [D.S.] as the problem child and blame her for the family being split apart." This showed "a lack of understanding concerning the responsibilities of parenting and accepting responsibility for actions." There also continued to be concerns about Father's ability to interact with the professionals who were trying to support the family. He had made much progress with his anger issues, but there was still "a great need to be able to control his anger in a way that does not make others feel unsafe in his presence." Finally, Father continued to use marijuana on a regular basis, and the social worker had recommended that he lower his use of marijuana and, if possible, discontinue using it.

At the July 24, 2014 dispositional hearing on the supplemental petition, Mother submitted on the social worker's recommendations and the juvenile court ordered family reunification services for Mother. Also, at Father's request, the juvenile court terminated the restraining order originally filed to protect the children from Father.

9

In the December 1, 2014 12-month status review report regarding Father, which was also the six-month status review report for Mother, the social worker reported that the children remained in separate out of home placements. Overall, they were making "remarkable progress" due to the "consistency and predictability of the caregivers."

The parents had lost their apartment and their vehicles had been impounded. They were currently homeless. Neither parent had a job and neither was consistently participating in services. The social worker described "the challenges presented by the parents who appear to be trying to avoid dealing with their issues by creating drama and chaos. This behavior has been very effective but, unfortunately counterproductive if they truly wanted to reunify with their children."

Father continued to use marijuana, with levels consistent with use of concentrated cannabis. In addition, during a random drug test, he tested positive for opiates. His attendance at his substance abuse counseling was poor and he was unwilling or unable to address his excessive marijuana use. His attendance at his Alternatives to Violence program had also been inconsistent. He had maintained regular and consistent contact with the children, and was able to meet their needs as individuals and as a group.[6] Father had struggled to consistently address his substance abuse and anger issues so as to make enough progress for return of the children to be considered. While there had been some progress, it had been limited. The social worker summarized: Father "continues to present himself as an angry man who has been wronged by everyone, yet refuses to take any personal responsibility for how his volatile actions are harmful and ineffective at getting his issues resolved." His substance abuse counselor believed that Father was in need of "Intensive Dual Diagnosis Substance Use Disorder treatment."

---

[6] Apparently these visits did not include D.S., who was very conflicted about the fact that Father did not want to see her.

The Agency recommended continuing Father's reunification services to 18 months to give him "an optimal opportunity to engage fully." The Agency also recommended continuing Mother's services for another six months, to the 12-month point.[7]

At the December 30, 2014 status review hearing, after receiving briefing from Father's counsel, the parties and the court agreed that Father was not at the 12-month review phase but, instead, was at the six-month phase since the children had not been removed from Mother's home until six months after Father began reunification services. At the hearing, Mother waived her right to reunification services as to D.S. The court ordered six months of continued reunification services for Mother as to her other four children. With respect to Father, the court found that Father had partially complied with his case plan, but the progress had been minimal. It nevertheless found that there was a substantial probability that the children would be returned within the next six months, and ordered family reunification services to continue for six more months as to his two children.[8]

Subsequently, at the request of the Agency, the parents' visitation was set to a higher level of supervision due to concerns that they were discussing inappropriate information with the children concerning court-related and other matters.

In the 12-month status review report filed on May 19, 2015, the social worker reported that the children remained in separate foster homes. Father continued to use marijuana, but had lowered his level of use, as shown by random testing. During a random drug test on March 12, Father tested positive for the presence of Benzodiazepines and opiates, as well as THC. He had submitted prescriptions to the social worker for the

_____

[7] Mother had decided she wanted to relinquish D.S. The social worker noted that D.S. had "wrongfully been identified by both parents as the problem and the cause of all issues within the family."

[8] During the hearing, counsel for the Agency raised the issue that both parents' THC levels were still at extremely high levels, and stated that the Agency "encouraged them to keep working on that, that we're monitoring that and we need to seem [*sic*] some improvement." The court agreed that the marijuana use and its effect on their parenting and on the children was "an issue that the parents should continue to address seriously."

opiates. Father had completed his anger management program, but his attendance had been inconsistent. He had reengaged in his family empowerment group in January, and had consistently attended since then. He was re-referred to his individual therapist, but refused to consider it. He was also referred to another therapist for individual and couples counseling, but refused to pursue this option either. Both parents remained homeless and were living in their car.

The parents' visits with the children were "at times pleasant and at times chaotic." Some of the problematic visits included a January 14, 2015 visit during which K.S. was upset and refused to get into the transport vehicle at the conclusion of the visit. Father picked her up, "aggressively forced her into" the vehicle, slammed the door, and walked away. At a visit on March 4, Father "became bothered by the presence of another father" who was visiting his own children. Father told the social worker assistant "that the man was someone he does not like." The two families were moved further apart, but Father "did check on the other visit several times before regaining his focus and returning his full attention to his own children." During a March 18 visit, Father's oldest stepdaughter told Mother and Father that she had had to wear dirty clothes to school the week before because she did not get her clothes to the laundry on time. Mother gave her a dress to take home with her. The following week, the social worker met with the parents and told them that the child had hidden the dress from her foster parents, and reminded them of the rule that none of the children were supposed to bring anything home from visits. Father said he did not like the rule. He became very upset and told the social worker "that he was going to take [her] to court about it." On April 1, the children arrived about 10 minutes late for a visit. Father appeared upset and asked the social worker assistant why they were late and about the time he would have with them. The social worker assistant said he would need to check to see if the time could be extended that day or during a future visit. Father became upset and told the social worker assistant, in the presence of the children, that " 'if these kids leave here before 5:30 you better have security.' " The social worker assistant considered this comment a threat of violence. Father left the visit, but eventually returned.

12

Although the parents had consistently and regularly visited with the children and had participated in services, the social worker did not believe they had made significant progress in resolving the problems that led to the children's removal. Nor did she believe that they had demonstrated the ability to provide for the children's safety, protection, and wellbeing. She therefore could not recommend return of the children.

With respect to concurrent planning, the foster parents of the two oldest children were willing to consider guardianship or adoption, and K.S.'s foster family was interested in the possibility of also taking Justin into their home.

The Agency recommended termination of reunification services and the setting of a section 366.26 hearing.

In an addendum report filed on June 2, 2015, the social worker related that K.S.'s foster parents wanted to be the concurrent plan for her, but could not take Justin in also. They were willing however, to support sibling visitation.

In addition, the social worker had learned that a hearing was scheduled for June 5, 2015, on a claim of civil harassment against Father, who stated that he believed the petitioner was trying to harass him. Mother later informed another social worker that the petitioner and she had been in a relationship when she and Father were separated, and Father had found out about their relationship. She also said she had obtained a temporary restraining order against Father. He had been drinking and shooting a gun around the home they were staying in, and had said he would hurt her if he had to. Mother told the social worker that she was going to request a permanent restraining order against Father.[9]

At the contested 12-month review hearing, which took place on June 3, 2015, Santiago Simental, Father's domestic violence and anger prevention facilitator testified that he had been working with Father for 18 months and that Father had completed the required 52-week class in April 2015. Father had made progress in dealing with his anger issues, but "a considerable amount of progress could still be made." In the past, Father had gotten physical with others when upset, but had changed in that, while still

_____

[9] A police report regarding this incident was attached to the social worker's report.

13

getting angry and posturing, he no longer crossed the line physically. Simental knew about the incident on April 1, 2015, in which Father had made a threat of violence against a social worker assistant. He knew about Father's recent claims of Mother's infidelity but had not heard about a threat against Mother. He also had heard about a confrontation Father was involved in the week before in which the police were involved. Simental would not have expected someone who had completed 52 weeks in his program to have reacted as Father did in that situation. Father had more run-ins with other people than Simental's average client did, although a number of clients still had issues with anger.

Ron Arkin, the facilitator of a weekly family empowerment group that Father attended, testified that Father had changed and made progress over the course of the group. As he became more comfortable, he was able to address his anger issues directly. He had gained insight, as when he told the group of his fear that his stepson was becoming just like him.

Robert Distefano, the social worker assistant who supervised Father's visitation with the children for much of the dependency, testified that, at the outset, Father had the "quickest trigger" he had seen, in terms of anger and impulse control. He had noticed a huge change since then. Father now seemed much calmer, with fewer upsets. Distefano did describe an incident on April 1, 2015, in which Father said, " 'if these kids leave here before 5:30 you better have security.' " Distefano was not sure how serious Father was, but he was concerned. When Distefano "called him on it," Father said he had to get out of there and left the building. Five minutes later, Santiago Simental called Distefano and said Father had called him about what had happened. Father then returned to the visit and apologized to Distefano.

Social Worker Paula Burns-Heron testified that she had been involved in Father's case since it began, over two years earlier. Father had always been very consistent in his visitation with his two biological children and two of his stepchildren. He was generally very good with the children. Burns-Heron had noticed changes in Father since the beginning of the case. He initially was very volatile, but had made huge strides in controlling his emotions. She believed he had made a very big step when he was able to

14

recognize that his behavior embarrassed his family. Father was also cooperative with the Agency. He had learned parenting skills, including the ability to address the needs of the children by individually giving them attention while keeping the others occupied.

Father had not complied with all of the requirements of his case plan. He had not participated in substance abuse treatment because he was not willing to stop smoking marijuana.[10] He also had not yet established adequate housing for the children. In addition, he still had anger issues and exhibited angry behavior. Burns-Heron found it "very difficult" to make the recommendation to terminate reunification services, explaining, "I have watched both of these parents work very hard and make progress, and still there's not enough change in order for me to recommend more services."

At the conclusion of the hearing, the juvenile court found as follows: "What [the Agency's] report shows and what the evidence corroborates here today is that the parents have worked on reunification and maintenance services for the 18 months this case has been opened, and that they did make some progress in addressing the difficult issues that warranted this case being initiated.

"On balance I do find, and the record is replete with evidence, that at this juncture, the parents have not made significant progress toward alleviating or mitigating the domestic violence issues that caused placement of their children in foster care.

"There is not a substantial probability that the children could be returned to the physical custody of the parents within 18 months of the initial removal from the home.

"The fact that father has worked on his domestic violence, completed a 52-week domestic violence class, and yet continues to engage in very recent behavior that was threatening and/or physically abusive of the mother leads the court to have high concern about the parents' ability to make progress where services could be extended to the 18-month family reunification review. [¶] . . . [¶]

---

[10] Burns-Heron could not recall a specific incident in which Father's medicinal use of marijuana had adversely affected his parenting abilities.

"The evidence seems to suggest that both parents can maintain during supervised visits, they are loving parents and do a good job offering activities and giving attention to the four children, who are all different ages. But in times of stress some of the dangerous behaviors have re-emerged, and like in the month of May where there were several instances of domestic violence or threats that would be detrimental to children."

The court terminated reunification services for both parents and set the matter for a section 366.26 hearing on October 1, 2015.

On August 12, 2015, Father filed this petition for extraordinary writ seeking review of the juvenile court's order.[11] On August 13, 2015, we ordered the proceedings in the juvenile court temporarily stayed, pending determination of the petition.

## DISCUSSION

### *Termination of Reunification Services*

Father contends that substantial evidence does not support the juvenile court's finding that he did not make substantial progress toward reunification. He asserts that his reunification services therefore should have been extended to the 18-month review hearing.

Section 361.5, which governs the provision of reunification services, provides, inter alia: "Except as otherwise provided in subparagraph (C), for a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was three years of age or older, court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in Section 361.49, unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(A).)[12] Subdivision (a)(3) of that section further provides that "court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical

---

[11] Mother is not a party to this writ petition.

[12] Although Justin was less than three years old when he was removed from Father's custody (see § 361.5, subd. (a)(1)(B)), he was placed on the same timeline as his older sister, K.S. (See § 361.5, subd. (a)(1)(A).)

custody of his or her parent or guardian if it can be shown . . . that the permanent plan for the child is that he or she will be returned and safely maintained in the home within the extended time period.  The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian. . . .  The court shall also consider, among other factors, good faith efforts that the parent or guardian has made to maintain contact with the child."  (Accord, § 366.21, subd. (g).)

"[T]o find a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time, the court shall be required to find all of the following:

"(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child.

"(B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home.

"(C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1); accord, rule 5.715(b)(4)(A)(i).)

"We review the juvenile court's findings for substantial evidence, and the juvenile court's decisionmaking process based on those findings for abuse of discretion. [Citation.]"  (*San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 223 (*San Joaquin Human Services Agency*).)

In the present case, it is undisputed that Father consistently visited with K.S. and Justin, as well as two of his stepchildren; that the visits went well; and that Father was very good at engaging with the children.  (See § 366.21, subd, (g)(1)(A).)  Unfortunately, the record also supports the juvenile court's finding that Father had neither made significant progress in resolving the problems that led to the removal of K.S. and Justin

17

nor demonstrated the capacity or ability to complete the objectives of his treatment plan or provide for the children's safety. (See § 366.21, subd. (g)(1)(B) & (C).)

The social worker and various service providers agreed that Father had worked hard, especially initially, and had made great strides in learning to manage his anger, which had been of an extreme nature. Nonetheless, at the time of the 12-month hearing, the evidence showed that he continued to have significant anger and domestic violence related issues, which included several incidents that occurred during visits with his children. These incidents reflected Father's overreactions to a variety of situations and an inability to control his anger, even in front of his children. It also included a recent interaction with Mother in which Father threatened her and she filed for a temporary restraining order against him.

As the juvenile court observed regarding the latter episode, Father had been working on his anger and domestic violence issues for some 18 months, and had completed, inter alia, a 52-week domestic violence/anger management class, "and yet continue[d] to engage in very recent behavior that was threatening and/or physically abusive of the mother." The court noted that while Father was a loving parent and could "maintain" during supervised visits, "in times of stress some of the dangerous behaviors [had] re-emerged," which made it extremely unlikely that the children could be safely returned to Father within the extended time period.

Father's continued volatile and hostile behavior, after so many months of services, justified the court's great concern about Father's ability to make sufficient progress to allow for a safe return of the children to his custody if services were extended for six more months. (See § 366.21, subd. (g)(1).)[13] As the social worker acknowledged at the

---

[13] Father argues that his use of marijuana should not have been used against him in this matter, especially given the social worker's acknowledgement that she had not noticed a specific incident related to his medicinal use of marijuana that had affected his parenting. Because Father's marijuana use was not the basis of the juvenile court's ruling, which we have found was supported by substantial evidence, it is not necessary to address whether Father's continued marijuana use and failure to complete a substance

12-month status review hearing, this is a very difficult case, given Father's obvious love for his children and his diligent efforts to overcome his long-standing issues with anger and domestic violence. We nonetheless conclude substantial evidence supports the juvenile court's findings that Father's progress was simply not sufficient to warrant an extension of reunification services at this late point in the process. (See *San Joaquin Human Services Agency*, *supra*, 227 Cal.App.4th at p. 225 ["[T]erminating reunification services can be heart wrenching," but " 'in order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate' "].)

Accordingly, the court did not abuse its discretion when it terminated Father's reunification services and set the matter for a section 366.26 hearing. (See *San Joaquin Human Services Agency*, *supra*, 227 Cal.App.4th at p. 223.)

## DISPOSITION

The petition for extraordinary writ is denied on the merits. Our decision is final as to this court immediately (rule 8.490(b)(2)(A)), and the stay imposed is hereby lifted.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Stewart, J.

---

abuse treatment program would also have been a proper ground for terminating reunification services and setting a section 366.26 hearing.

19